# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MID-CONTINENT CASUALTY CO.,

        Plaintiff,

        v.                                No. CIV-11-0329 WJ/LAM

I&W, INC., CIRCLE S FEED STORE, LLC,
RICHARD L. MENUEY and MARY L. MENEUY,

        Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court following remand by the Court of Appeals for the Tenth Circuit, upon a Motion for Summary Judgment filed by Defendants/Cross-Plaintiffs Circle S Feed Store, LLC, Richard L. Menuey and Mary L. Menuey ("Defendants" or "Circle S Defendants") on December 17, 2014 **(Doc. 143).**   Having reviewed the parties' briefs and applicable law, the Court has determined that Defendants' motion shall be GRANTED with regard to coverage, but DENIED as to the issue of whether all of the general commercial policies are triggered for coverage.   The Court DEFERS ruling on Defendants' request for attorney's fees under 28 U.S.C. § 2202, which will be handled separately when the Court addresses Defendants'/Cross-Plaintiffs' Motion for Entry of Declaratory Judgment; as well as the issue of whether the policies provide coverage for punitive damages.[1]

---

[1] The Court will address the coverage issue for punitive damages when addressing Plaintiff's Motion for Summary Judgment on Punitive Damages.  See Doc. 145.

## BACKGROUND

This case centers around an insurance coverage dispute in which the parties seek a determination as to whether Plaintiff ("MCC") owes Defendant I&W, Inc. ("I&W") a duty to indemnify I&W for damages sought and awarded in an underlying state court action for property damage that occurred as a result of I&W's mining operations.  The I&W property is adjacent to the Defendants' property upon which sits the Circle S Feed Store located in Carlsbad, New Mexico. I&W's facility is located on private property in a developed area of the City of Carlsbad, at the intersection of two highways and adjacent to the Carlsbad Irrigation District ditch that serves farmers in the southern portion of the state.  I&W owned and operated a brine well facility which was involved in the solution mining of salt from brine water.   In such an operation, a well is drilled into a salt zone. The operator injects fresh water into the salt zone, where it dissolves the salt.  The resulting brine water is pumped out and sold.  Through the mining process, the salt zone dissolves away from the earth in which it was embedded, leaving behind an underground cavern.   I&W's solution mining operations took place between 1995 and 2008.

## I.      Underlying State Court Lawsuit

In the state court lawsuit, the Circle S Defendants sued I&W for property damage due to its solution mining operation underneath the property owned by I&W and Defendants, which occurred when the roof of the underground cavern collapsed.   The Circle S Defendants were plaintiffs in the underlying state court lawsuit and alleged that their property had been diminished in value due to I&W's mining operation.  The lawsuit was filed in November of 2009 in the Fifth Judicial District Court, State of New Mexico, County of Eddy.  *Circle S Feed Store, LLC, Richard L. Menuey and Mary L. Menuey v. I&W, Inc.*, case number CV-2009-793 ("state court lawsuit").  On February 27, 2012, a verdict was reached in favor of the Circle S parties.

The jury found I&W to be 100% negligent, as well as reckless or wanton, and that this negligence was the cause of the property damage.  The jury awarded Defendants $703,000.00 in compensatory damages and $300,000.00 in punitive damages.  See Doc. 93, Defts' MSJ, Ex. B; Doc. 82 (MCC's MSJ), Ex. 26, Ques. No. 6; Doc. 135-1 (state court Judgment, 4/24/2012).

## II.    Federal Action and Appeal

Prior to the entry of judgment in the state court lawsuit, MCC filed a declaratory judgment action in this Court seeking a declaration that the insurance policies did not afford liability insurance coverage for the claims asserted against I&W in the underlying lawsuit, and that it had no duty to pay any judgment or settlement.   The parties filed cross-motions for summary judgment in the federal action on coverage issues, and on October 31, 2012, the Court granted summary judgment in favor of MCC, noting that were it not for the "Oil Endorsement provision" in the insurance policy, Plaintiff's motion would have been denied and the Court would have found that coverage existed.   The Court specifically pointed out that the Circle S Defendants had offered no argument in response on the Oil Provision argument raised by Plaintiff in its summary judgment motion:

> Defendants' response to Plaintiff's argument on this issue is less than half a page. Defendants offer no legal argument or factual basis as to the applicability of the provision to the facts at hand.

See Doc. 114 at 9.   On the Circle S parties' motion, the Court amended the Final Judgment to note that the Court "would have found that coverage existed, but for the language in the Oil Industries Limitation Endorsements." See Doc. 120, Amended Final Judgment. Defendants appealed the Court's ruling and on June 17, 2014, and the Tenth Circuit reversed in part, finding that the oil industries limitation endorsement in the company's excess/umbrella policies did not apply to preclude coverage under its primary policies. *Mid-Continent Cas. Co. v. Circle S Feed*

*Store,* LLC, 754 F.3d 1175 (10th Cir. 2014).   The Court of Appeals otherwise agreed with this Court's findings on coverage under the primary policies.  754 F.3d at 1186.

With the Tenth Circuit's reversal of this Court's finding that Plaintiff MCC was entitled to summary judgment, the Court must now consider whether Defendants are entitled to summary judgment, and must also consider Plaintiff's motion regarding whether punitive damages are covered under the policy, which the Court will address separately at a later time.

### DISCUSSION

In this motion, Defendants seek summary judgment on coverage under the MCC policies for the judgment entered in the underlying state court lawsuit.  They contend that: (1) the MCC policies are available for coverage because property damage was caused by an "occurrence" in the policy periods and damages resulted from the property damage; and (2) the policies were triggered by Circle S' damage which was caused by an occurrence during the policy periods. Plaintiff contends that:  no "occurrence" happened because the damage was expected or intended, and that the policies may not be stacked as a matter of law.  Plaintiff also argues that economic losses are not covered under any MCC policies.

## I.    Undisputed Facts[2]

The relevant facts pertaining to coverage under the primary policies are largely undisputed and were affirmed by the Tenth Circuit on Plaintiff's motion for summary judgment. Lowell Irby formed I&W with a partner in 1957.  Lowell's son, Eugene Irby, began working at I&W in 1990 and eventually became its vice president and general manager in 2001 or 2002, and worked as I&W's business manager in 1995.   In 1995, I&W purchased the solution mining operation owned by a company called B&E.   When the Irbys took over the operation, both Lowell and Eugene knew how brine well mining worked, in that it involved fresh water injection

---

[2]  Citations to supporting evidence are contained in the briefs.

in a well to wash salt from the geological formation to make a brine solution that is then pumped out of the well.   Eugene Irby knew salt was mined to produce brine by injecting fresh water, making a solution and pumping it out, and that the solution mining washes the salt from the formation.  He also knew that as the salt is washed out of the formation, the cavern becomes bigger and bigger. George Parchman, a manager at I&W, was in charge of the day-to-day operation of the brine well starting in 1995.   Kevin Wilson also worked for I&W for 26 years and took over the day-to-day operation in 2005 or 2006.

I&W operated two wells, Eugenie #1 and #2 for the mining process.  Eugenie #1 was shut down by I&W and ceased producing in July 2008.  Eugenie #2 on I&W's property was shut down in 2000.   Lowell Irby had sonar testing done as required by the New Mexico Oil Conservation Division ("OCD"), but sonar testing cannot accurately depict the size of a cavern because of the insoluble layers of salt.

According to seismic data interpretation, the cavern that was created by the salt mining extended onto the Circle S property, including underneath the structures, and was capable of causing catastrophic damage to the structures even without a complete sinkhole.   Borehole tiltmeter data showed that the ground is moving on the Circle S property.[3]  It was determined that the roof of the cavern has been unstable since at least 2002.  The cavern has increased in size over the years, and nineteen feet of cavern roof has crumbled down.  The Circle S  property has experienced drainage problems, and inside the Circle S feed store there are cracks along the central wall, floor and in the concrete.   In March 2009, Wendy Fech, a former Circle S employee, was sitting at her desk in the feed store and noticed a crack in the wall above the

---

[3] The briefs do not define "borehole tiltmeter." However, the Court conducted an internet search and discovered the following definition: A tiltmeter is an instrument designed to measure very small changes from the horizontal level, either on the ground or in a borehole." *See Borehole Tiltmeters*, UNAVCO, http://www.unavco.org/instrumentation/ geophysical/borehole/tiltmeter/tiltmeter.html (last visited Feb. 5, 2015).

office door, and also noticed large cracks in the older concrete floor.  Ms. Fech took photographs of the cracks.

The value of the damaged Circle S property and structures is currently $0 as compared to $703,000.00 prior to the damage.  The Circle S property is unsellable and unmarketable according to Carlsbad realtors because of the possibility of a collapse.

MCC issued commercial liability policies to I&W for successive 12-month policy periods from June 1, 2000 through June 1, 2009.  With the exception of the 2003-2004 policy which had $2,000,000 per occurrence and $2,000,000 aggregate, all policies had limits of $1,000,000 per occurrence and $2,000,000 aggregate.  Each policy contained substantially identical grants of coverage language and definitions. The relevant provisions in the liability policy state:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

See Doc. 143-15 at 2.

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

> "Property damage" means:

> > a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> > b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Doc. 143-15 at 3.

**II.    Disputed Facts**

A.    <u>Plaintiff's Disputes of Fact</u>

In its response, MCC disagrees with several of Defendants' statement of facts, although the Court finds that Plaintiff presents no supporting evidence which would constitute triable issues of material fact.  The vast majority of the disputes center around the subjective intent or awareness of the I&W representatives.   MCC's position is that these individuals were sufficiently aware of the danger associated with the cavern size so that the resulting damage could be considered expected or intentional, and thus outside of the coverage provisions in the policies.   However, none of the "disputes" of fact present the Court with any new material that was not before the Court previously on the issue of whether the damage was expected or intentional based on the awareness or knowledge of any of these individuals.

In Fact 7, Defendants state that Kevin Wilson, I&W's Operations Manager, was unaware that brine well operations created a cavern or that there had been collapses of caverns in other states and counties.  Plaintiff claims that the referenced deposition testimony refutes this, but the deposition is accurately reflected in Defendants' Fact No. 7, with Mr. Wilson stating that he "never really thought about" whether brine well operations created a cavern, and that no one in his company had said anything to him about whether collapses had occurred in other places. Doc. 143, Ex. H at 8:9-11 and 19; at 9:12-19 (Wilson Depo.).  Lowell Irby testified that he had not done sufficient research to find out about collapses from brine well mining in other parts of the world.   Doc. 143, Ex. G at 15:20-24 and 16:19-25 ("We knew none had happened in this area"; "I didn't know enough about brine wells to know [that the roof could collapse if you create an underground cavern]").   Plaintiff's interpretation of the deposition testimony is unreasonable and therefore fails to create a dispute of fact.

Plaintiff also disputes Defendants' Fact 18, which states that the cavern roof is not stable. Plaintiff claims that the question about the cavern roof stability was posed to Jim Griswold but was under objection and never answered.   However, the Court finds no objection to this question in the trial transcript, and notes that Mr. Griswold did in fact answer the question.  Doc. 143, Ex. C at 176-77:21-10 (discussing "overburden" of the soil above the cavern and that rock above the soil had "fallen away").  The Court finds that Plaintiff's so-called "dispute" misrepresents the plain statements in the deposition and fails to create a material dispute of fact.

Plaintiff also disputes Facts 42 and 43, which state that both MCC and the insurance agency selling the MCC policies to I&W were aware of the I&W brine water wells and the sales of that product as a majority of its revenues.  MCC does not actually dispute these facts, but claims there is no evidence to support these facts because the supporting documents refer to "water sales" and not "brine water sales."  However, as Defendants observe, the documents in question refer to the "Eugenie Brine Well" and "Ernie Brine Well" in Artesia, as well as a "Salt Disposal System."  Exs. Q & R.  The Court agrees with Defendants that these references lead to a reasonable inference that I&W was selling brine water, and so Plaintiff has not offered anything to create a material dispute of fact for Facts 42 and 43.

Last, Plaintiff disputes Fact 47, which states that none of the MCC commercial general liability or excess policies contain a specific punitive damages exclusion applicable to the claims litigated in the state court lawsuit.  The Court will defer a finding on this issue, and will resolve the question of whether punitive damages are available under the policies separately, when addressing Plaintiff's Motion for Summary Judgment on Punitive Damages.  *See* Doc. 145.

B.    Defendants' Disputes of Fact

In turn, Defendants present facts mainly to "clarify" several of Plaintiff's Additional Facts which concern the issue of subjective intent on the part of Lowell and Eugene Irby (Pltff's Add'l Facts 4 & 20); Lowell Irby (Pltff's Add'l Facts 6-8, 16-17); George Parchman (Pltff's Add'l Facts 9, 11, 13-15 and Kevin Wilson (Pltff's Add'l Facts 22-26).   However, Defendants' clarifying facts are of minimal consequence, since Plaintiff's Additional Facts in themselves do not sufficiently illustrate that any of the I&W representatives possessed the knowledge or awareness that the cavern was in danger of collapsing because of its increasing size.

For example, Plaintiff's facts state that both Lowell and Eugene Irby knew how the brine well process worked in that the cavern becomes bigger as the salt is washed out of the rock formation, and that sonar tests were conducted on that part of the ground in order to determine the size of the cavern.   Based on these facts alone (and as Defendants' facts "clarify,") one cannot reach the conclusion that Lowell and Eugene Irby expected the cavern to get large enough to be in danger of collapsing under the Circle S property.   *See* Doc. 82-1 (Lowell Depo.) at 18:8-10 (Lowell did not know how big the cavern was or that the size was large enough to present an imminent danger).

Defendants dispute Plaintiff's Additional Facts stating that Mr. Parchman was aware of the danger of creating a cavern below the surface of the brine wells.  He was also aware that one of the reasons I&W performed pressure testing of the wells was to make sure I&W was not washing out salt deeper into the salt bed.  As Defendants point out, this general awareness is a far cry from suggesting that Parchman had the expectation of imminent danger for the brine well cavern under the Circle S property, and thus Plaintiff's facts are insufficient to support a finding

that the damage came under the insurance provision excluding coverage for "expected or intended" injury.

Plaintiff also presents Additional Facts concerning Kevin Wilson, I&W's Operations Manager.  Wilson knew that solution mining involved the forcing of water down to wash the salt out of the formation and was aware that a sonar had been taken of the cavern.  He also assumed that the cavern would continue to grow as more brine was produced.   However, these facts do not suggest that Wilson was aware that the cavern's size had grown to a degree to where it was in danger of collapsing.   Moreover, while Plaintiff makes much of the sonar testing that had occurred, MCC does not dispute the fact that sonar testing cannot accurately depict the size of a cavern because of insoluble layers of salt.  Defts' Fact 16.   Defendants present evidence that shows that Wilson learned what he knew of brine well mining from George Parchman.  *See* Doc. 143-8 at 7:20-23 (Wilson's testimony that Parchman showed him "a little bit about what was going on"; Doc. 143-8 at 8:2-19 (Wilson "never really thought about" whether washing the salt out of the formation created a cavern).

Plaintiff's Additional Facts add nothing new to suggest to the Court that its earlier findings need to be revisited, and nothing to suggest that any of the I&W representatives possessed an intent or awareness sufficient to constitute an expectation that the cavern had grown large enough to pose an imminent danger to property which was adjacent to the I&W's property.

As a result, the facts as presented by Defendants remain undisputed.

## III.    Legal Standard

Summary judgment is appropriate when there are no genuinely disputed issues of material fact and, viewing the record in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law.  *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th

Cir. 2007). Once the party moving for summary judgment properly supports its motion, it is incumbent on the non-moving party to respond with some showing of an issue of genuine material fact. *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978 (10th Cir. 1991), *overruled on other grounds by Kendrick v. Penske Transp. Svcs.*, 220 F.3d 1220, 1228 (10th Cir. 2000). The nonmoving party may not rest on averments in its pleadings, but instead must establish specific triable issues. *Gonzales v. Miller Cas. Ins. Co. of Texas*, 923 F.2d 1417 (10th Cir. 1991). The mere existence of some alleged, immaterial factual dispute between the parties will not defeat an otherwise properly  supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

## IV.    Analysis

Coverage exists under the MCC policies for "bodily injury" and "property damages" only if it is caused by an "occurrence" that takes place in the "coverage territory."  Doc. 82-11 at 3, ¶ 1(b).   The policy defines "occurrence" as an "accident including continuous or repeated exposure to substantially the same general harmful conditions."   Doc. 82-11 at 5, ¶ 13.   While the term "accident" is not defined in the policy, New Mexico law defines "accident" as an event that takes place without one's foresight or expectation, or an event "which is not expected or designed." *O'Rourke v. New Amsterdam Cas. Co.*, 68 N.M. 409, 412 (1961) (terms not defined in policy must be interpreted in its usual, ordinary and popular sense); *Vihstadt v. Travelers Ins. Co.*, 103 N.M. 465, 466 (1985) (defining "accident" as an event that occurs without design or purpose).  See Doc. 114 at 5-6 (Court's Mem.Opin. & Order).

A.    <u>Issues Previously Ruled On and Affirmed by the Tenth Circuit</u>

In the instant motion, parties raise the same facts and arguments that were raised in the pleadings on Plaintiff's motion for summary judgment.   The Court ultimately granted that

11

motion, but before concluding that Plaintiff was entitled to summary judgment on the sole basis of the Oil Endorsement provision, this Court made specific findings:

(1) I & W did not expect the property damage that occurred as a result of the continued enlargement of the caverns from the salt mining, rejecting Plaintiff's argument that there was no "occurrence" (or "accident") as defined in the policy;

(2) Defendants had offered facts showing that the harm alleged in the underlying complaint was not expected or intended by I&W, rejecting Plaintiff's contention that there no coverage because of the provision excluding coverage where the insured expected or intended the harm; and

(3) while the measure of damages argued at the state court trial was related to diminution of property value, the damages evidence presented at trial "was used to calculate the measure of damages caused by I&W and would be covered under the Policy." Doc. 114 at 9. In making this finding, the Court rejected Plaintiff's argument that the state court jury awarded damages based on diminution in value, which is an economic loss not covered under the policy.

The Tenth Circuit agreed with this Court that the Oil Endorsement excludes coverage under the excess/umbrella policies, but held that "the Oil Endorsement does not exclude coverage that otherwise exist under the primary policies," 754 F.3d at 1186, thereby affirming this Court's specific findings and conclusion that, without considering the Oil Endorsement provision, coverage existed under the primary policies:

> [T]he district court was correct: the primary policies cover the damages awarded to Circle S. The loss of value of Circle S's property stemmed directly from a physical injury to Circle S's real property. It is uncontested the subsidence and cavern growth in Circle S's subsurface property qualifies as a physical injury to Circle S's property. This physical injury resulted in a danger of collapse of Circle S's property, which renders the property completely valueless. Under these

> circumstances, diminution in value damages constitutes "damages because of . . .
> "property damage" to which this insurance applies.

754 F.3d at 1185-86.

Based on the Court's previous findings as well as the Tenth Circuit's affirmance of those findings, further discussion is unnecessary on the issues of (1) whether coverage was available based on an "occurrence" and (2) whether damages resulted from the property damage.   MCC is therefore foreclosed from pressing on with these issues.   For example, in its previous motion for summary judgment, MCC relied on *Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 864 F. Supp. 2d 1157 (D.N.M. 2012) to argue that the correct standpoint on the coverage question is not whether the injury was intended, but whether the action that caused the claimed injury was intended.   The Court previously considered *Gandy Dancer* in ruling on Plaintiff's motion for summary judgment.   Plaintiff's argument based on that case failed before, and it still fails.   This Court had found that the facts in *Gandy Dancer* were distinguishable because in that case, the court found that the water diversion system that had been constructed by the railroad maintenance contractor had worked exactly as it was intended.   Because that system was *intended* to change the natural flow of a river and to divert water onto the landowner's property, the resulting damage to the landowner's property was not caused by an "occurrence" as covered under the policy because it could not be defined as an "accident," and thus was an expected or intended harm which was excluded from coverage.  *Id.* at 1196.   As the Court previously noted:

> Based on the available testimony, it appears that Lowell and Eugene Irby were
> aware that salt mining leaves behind underground caverns, but none of the
> testimony can be characterized as stating they expected or designed that the
> caverns would grow to a size that would result in property damage.

Doc. 114 at 6.

The Court need not revisit the issue of whether Defendants suffered merely economic damages.  The Court previously found that while "pure economic loss without physical injury does not come within coverage under the Policy, this is not the situation here." *See* Doc. 114 at 9. There is also no need to revisit the issue of whether Defendants are seeking coverage for purely economic loss, since the Court previously found that "the damage sustained by Defendants—the roof collapse into the cavern as well as other structural damage and drainage problems—is not intangible or merely an economic loss." Doc. 114 at 8.

On appeal, the Tenth Circuit affirmed this Court's findings:

(1) "[t]he district court correctly concluded that the damages to Circle S's property were caused by an 'occurrence' and are thus covered under the primary policies," 754 F.3d at 1183;

(2) "[t]he district court was correct to hold the 'intentional injury' exclusion does not apply," *id.*; and

(3) while "[t]he figure awarded, $703,000.00, matches the figure an expert testified [in the state court lawsuit] was the diminution in market value of the property . . . the figure awarded reasonably measures the damages arising out of the physical injury to the property." *Id.* at 1185.

The Court's findings on these issues, and the Tenth Circuit's affirmance of those findings, operate to find in favor of Defendants on the question of whether the damage to the Circle S property is covered under the policy.   As a result, Defendants are entitled to summary judgment on the coverage issue in that MCC is obligated to indemnify I&W for the damages awarded in the state court lawsuit.

B.    <u>Whether Coverage is Available Under All Policies</u>

Defendants contend that coverage is triggered under all the general liability policies issued by MCC, worth $19,000,000 in total coverage, instead of being covered under one of the

policies issued during a particular time period.   As a threshold matter, the Court disagrees with

MCC that this issue is not ripe.   In the underlying state court lawsuit, Defendant I&W was

ordered to pay $703,000.00 in compensatory damages and $300,000.00 in punitive damages.   In

considering Defendants' motion for summary judgment herein, this Court has found that MCC is

obligated to indemnify I&W for these amounts under the terms of the policies, making this the

right time to determine what policies provide coverage.

It is undisputed that I&W's mining operations took place between 1995 and 2008, that

the damage occurred during that time, and that the damage occurred as a result of those mining

operations.   It is also undisputed that MCC issued commercial liability policies to I&W for

successive 12-month policy periods from June 1, 2000 through June 1, 2009, each having limits

of $1,000,000 per occurrence and $2,000,000 aggregate (with the exception of the 2003-2004

policy).   Defendants contend that the policy language does not require that damages are known

before insurance is triggered, even if the damage did not manifest itself until later in 2009 when

Wendy Fech photographed several of the cracks, before the last MCC insurance policy expired.

Plaintiff objects to Defendants' argument that damages need not actually occur at any particular

time as long as the occurrences resulted during the policy period, and that all of the policies can

be stacked.   MCC contends that Defendant's attempt to stack all the policies is contrary to New

Mexico law and is inconsistent with New Mexico public policy.

As the parties acknowledge, courts have generally used four approaches to the trigger of

coverage as described in *Appleman on Insurance 2d* § 145.3(B)(1) at 13-14 (2003), which are:

(1) manifestation, (2) injury-in-fact or actual damage; (3) exposure; and (4) continuous trigger.

Doc. 143 at 24, n.3.  Defendants urge the Court to apply a continuous theory, and in particular,

reject the manifestation theory in this case.  They cite first to an environmental contamination

case decided by the New Hampshire Supreme Court, *EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's,* 848 A.2d 715 (N.H. 2004).   That court found that for coverage to exist, the "occurrence" causing the property damage must have taken place during the policy period; however, the policy did not require that the resulting property *damage* had to take place during the policy period.   The court also found that coverage was triggered by the injury-in-fact rather than manifestation of the damage, and when the contamination was continuous, the injury-in-fact theory operated to trigger coverage on a continuous basis.   Defendants contend that *EnergyNorth* is analogous to the instant case because the MCC policies are also occurrence-based.

Defendants also rely on a California case, *Montrose Chemical Corp. of California v. Admiral Ins. Co.*, involving injuries allegedly occurring in connection with the disposal of toxic or hazardous wastes.   913 P.2d 878, 881 (Cal. 1995) (in bank).   The California Supreme Court found that where there were successive policies, bodily injury and property damage that was "continuous or progressively deteriorating throughout several policy periods [was] potentially covered by all policies in effect during those periods."   The *Montrose* court concluded that for third-party liability insurance cases involving continuous or progressively deteriorating losses, the continuous injury trigger of coverage should be adopted.   *Id.*   Defendants note that a Texas Court of Appeals case, *Pilgrim Enterprises, Inc. v. Maryland Casualty Co.,* also rejected the manifestation theory in a case involving exposure to contaminants.   24 S.W. 3d 488 (Tx. Ct. App. 2000).   In *Pilgrim Enterprises,* the court found that based on the definition of "occurrence" in the policy, the occurrence—which was the exposure to underground contamination from pollution, rather than the manifestation of the injury or damage—was the trigger of coverage for bodily injury and property damage.

16

Defendants contend that the "continuous trigger" theory should be adopted here as well, pointing to a Wisconsin state court case, *Society Insurance v. Town of Franklin,* which noted that the majority of courts have done so.  607 N.W. 2d 342, 346 (2000) (citations omitted).  The *Town of Franklin* case involved the cleanup of contaminated land that used to be a town dump.  The Wisconsin Court of Appeals applied the "continuous trigger" theory of coverage, reasoning that while an injury occurring during the policy period generally triggers coverage, "[i]n cases involving ongoing exposure to a harmful substance . . . the exact date of harm is uncertain and the harm often occurs over several policy periods."  *Id.* at 346.  The court held that coverage under several annual commercial liability policies could be aggregated for the one ongoing occurrence that caused continuous property damage for several years.

Defendants argue that the MCC policies already contemplate that an "occurrence" may be continuous and thus continually cause damage and thus, as long as the damage occurred sometime during the policy period, coverage is triggered under all the policies that existed during that period.   However, Defendants rely on a line of cases which the Court finds is factually unsound, and has questionable legal support in this jurisdiction.  The Court agrees with Plaintiff on this issue, and as a result, Defendants have not persuaded the Court that the "continuous injury" theory should be applied in this case.

To start with, the Court agrees with Plaintiff that the cases cited by Defendants are sufficiently distinguishable to foreclose reliance on those cases.  For example, the property damage in *EnergyNorth* involved the leaking of hazardous contaminants onto a site over time and the migration of those contaminants through the soil causing continuous injury to the property.  The case at bar is not an environmental contamination case.  Here, there is no evidence concerning exactly what damage took place during any policy period.  Because Defendants in

this case cannot establish when any such "loss" occurred, the analytical framework of a "continuous injury" theory is inappropriate, and there is no support for a finding that coverage is triggered across all the policies that were issued to I & W.   The cases cited by Defendants may also be distinguishable for other reasons.   For example, Plaintiff asserts that following the California Supreme Court's decision in *Montrose,* insurers began to include language in policies that would limit the application of the continuous or progressive injury concept.   Thus, the holding in *Montrose* may not be found to apply across the board even for factually similar cases.

Plaintiff also contends that the majority of courts have applied the "manifestation of injury" theory, and not the "continuing injury" theory, to determine when and whether an occurrence under a policy takes place.   In *Business Interiors, Inc. v. Aetna Casualty and Surety Co.,* the Tenth Circuit chose to apply the general rule that "an occurrence is determined by the cause or causes of the resulting injury."   751 F.2d 361, 363 (10th Cir. 1984).   The cause of the insured's loss in *Business Interiors* was the continued dishonesty of one employee in forging and altering 40 checks.   In its analysis, the Tenth Circuit looked to Oklahoma law (which governed in that case) and relied on a Third Circuit case which stated that the "majority of jurisdictions employes [sic] the 'cause theory.'"   *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56, 61 (3rd Cir. 1982) (quotation omitted).   Applying a "cause" theory of coverage, the court concluded that the insurer suffered only one loss—caused by the employee's continuing acts of dishonesty—and could not be viewed as forty separate losses under the policy.   *Business Interiors*, 751 F.2d at 363.   Plaintiff analogizes the fact pattern in *Business Interiors* to the instant case: Circle S's property damage arose from the operation of the brine well, which is one alleged occurrence; the loss of subjacent support and the collapse of the cavern caused the

damage underneath the Circle S property, notwithstanding the fact that the damage resulting from that occurrence may have spread in area over time once the collapse occurred.

The Court also agrees with Plaintiff that Defendants' reliance on cases from other jurisdictions does not take New Mexico law into account.  *See EnergyNorth Natural Gas, Inc.*, 858 A.2d at 718 (determining the type of event that will trigger coverage "depends upon the language used in the policy and the relevant state law").[4]   New Mexico law has declined to take a firm position espousing any one theory, instead viewing it as a matter of contract law:

> The Court finds it improper to engage in an analysis of which theory of insurance coverage the New Mexico Supreme Court would adopt if confronted with the question. Insurance is fundamentally a matter of contract law.

*Servants of Paraclete, Inc. v. Great American Ins. Co.*, 857 F. Supp. 822, 830 (D.N.M. 1994) (citing *Farmers Alliance Mut. Ins. Co. v. Bakke*, 619 F.2d 885, 888 (10th Cir. 1980)).

Plaintiff  describes the question of whether all policies provide coverage here as a stacking issue, which the Court finds distinguishable from a coverage theory issue. Nevertheless, the stacking issue is relevant to the question of whether coverage is available under all the MCC general commercial policies issued to I&W, and needs to be considered in that context as well.   New Mexico courts have addressed the issue of stacking in the context of automobile policies and uninsured motorist ("UM") coverage, but not in the context of commercial general liability policies.  Under that line of cases, New Mexico courts have held that stacking may be appropriate either when it is granted by the express terms of the policy ("policy stacking") or on the grounds of public policy ("judicial stacking"). *Jaramillo v. Providence Washington Ins. Co.*, 117 N.M. 337, 339 n.1 (1994) (discussing stacking for

---

[4]   Defendants do not challenge Plaintiff's argument that New Mexico law governs in this case, and it would seem that Plaintiff's argument is correct, given that the insurance contract was executed in New Mexico.   *See* Doc. 20-2 (Ex. 2 to Amended Compl.).; *see also Armijo v. Ex Cam, Inc.,* 843 F.2d 406 (10th Cir. 1988); *accord Cooper v. Cent. Sw. Servs.,* 271 F.3d 1247, 1251 (10th Cir. 2001).

uninsured motorist coverage).   The public policy basis assures that the insured gets what he pays

for and at the same time fulfills the insured's reasonable expectations.   *Rehders v. Allstate Ins.*

*Co.,* 139 N.M. 536, 544 (Ct. App. 2006).    In the context of uninsured motorist coverage,

"stacking" refers to the right of an insured to aggregate the coverage under two or more policies

(interpolicy stacking), or under one policy covering more than one automobile (intrapolicy

stacking), until all the damages of the insured are satisfied or until the limits of the applicable

policies are exhausted.   *Id.*

The Court is not convinced that Defendants can resort to "stacking" the policies for

which I&W paid premiums over the years.   There is no language in the MCC policies that could

be interpreted as allowing stacking.   While Defendants counter that there is also no "anti-

stacking" language in the policy, the policy language can only be read to foreclose the possibility

of stacking in this case.   Defendants point to policy language which states that the "Limits of

Insurance of this Coverage Part apply separately to each consecutive annual period."   Doc. 149-

1.  It is undisputed that the MCC policies are based on claim occurrences, and that each policy

issued covered a discrete time period.   *See* Defts' Facts 34-37.   The question, then, is whether

*consecutive* policies, covering distinct policy periods, can be stacked to multiply coverage for a

single claim involving indivisible injury.

While New Mexico courts have not considered this question, the Texas Supreme Court

has, and the Court finds its analysis useful here.[5]   In *American Physicians Insurance Exchange*

*v. Garcia*, 876 S.W. 2d 842, 843 (Tex. 1994), a doctor was sued for malpractice over his

---

[5]  The fact that no New Mexico case has directly addressed the question does not mean that an analysis cannot be undertaken and a determination made by this Court without a more formal inquiry about what New Mexico courts would do, or without certifying the question to the New Mexico Supreme Court.    First, cases from other jurisdictions that have applied a "continuing injury" theory of coverage are distinguishable in their facts, which would militate against applying that theory to the case here on that basis alone.   Second, New Mexico law requires that each policy be interpreted according to its own contract terms.    The MCC policies cannot be construed to provide for either the "continuing injury" theory of coverage, nor for the kind of stacking Defendants seek.

prescription of two drugs which allegedly caused a patient to develop tardive dyskinesia, a debilitating brain disease.   The court rejected the argument that the doctor's three consecutive one-year "occurrence" policies could be stacked in order to raise the per-occurrence limit, and instead held that "consecutive policies, covering distinct policy periods, could not be 'stacked' to multiply coverage for a single claim involving indivisible injury." *Id.* at 853  The court reasoned that "[e]ven the jurisdiction embracing the broadest coverage trigger rule has held that multiple coverage does not permit an insured to "stack" the limits of multiple policies that do not overlap." *Id.* at 854.

The reasoning of the Texas Supreme Court in *American Physicians Insurance* is applicable here.   The MCC policies were issued for consecutive years, did not overlap in time, and the injury to the Circle S property resulted from a single, indivisible injury.   Even where an "occurrence" triggers more than one policy because it covered different policy periods, the appropriate conclusion is not to stack the consecutive policies because "different limits may have applied at different times." *See id.* at 855.    The Texas Supreme Court concluded that the solution was to apply whatever indemnity limit applied during the policy period "when the insured's limit was highest." *Id.*   In this way, the insured would still get the full benefit of his premiums and reasonable expectations of coverage.    Plaintiff offers cases from other jurisdictions that share the same view that policies spanning different time periods may not be stacked. *See N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 558 (5th Cir. 2008) (applying Texas law to preclude temporally stacking of the policies for indemnity purposes when the series of acts alleged constituted a single occurrence under the policy); *Great Lakes Dredge & Dock Co. v. City of Chicago,* 260 F.3d 789, 793-94 (7th Cir. 2001) (refusing under Illinois law to stack policies for single tort that spanned multiple policy periods when

policy language did not so provide); *Certain Underwriters at Lloyd's London v. Valiant Ins. Co.,* 229 P.3d 930, 932 (Wash. Ct. App. 2010) (holding that policies could not be stacked where water intrusion damage to a building continuing over a period of years was caused by a single occurrence); *Hartford Cas. Ins. Co. v. Med. Protective Co. of Ft. Wayne, Ind*., 641 N.E. 2d 545, 549 (Ill. Ct. App. 1994) (holding that continuous failure to treat due to medical malpractice was a single occurrence that caused the injury).

The Court finds that the damage to Circle S' property resulted from a single occurrence, and under the terms of the policy, there is no basis for stacking all the policies issued to I&W from 2000 to 2009, or for a finding that coverage exists under all the policies under a "continuous injury" theory.   However, the Court finds the reasoning of the Texas Supreme Court in *American Physicians Insurance* to be persuasive authority.   Accordingly, MCC is obligated to cover the damages awarded in the state court lawsuit under the 2003-2004 policy which had limits of $2,000,000 per occurrence and $2,000,000 aggregate.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **(Doc. 143)** is hereby GRANTED IN PART AND DENIED IN PART as follows:

The Court GRANTS the motion in finding that Plaintiff is obligated to indemnify I&W for the amounts awarded to the Circle S Defendants in the underlying state court lawsuit.

The Court DENIES the motion in finding that Defendants have not succeeded in convincing the Court that coverage is available under all of the MCC general liability policies issued consecutively over the period 2000 through 2009.   However, the Court finds that MCC is obligated to cover the damages awarded in the state court lawsuit under the 2003-2004 policy which had limits of $2,000,000 per occurrence and $2,000,000 aggregate.  The  Court  DEFERS

ruling on Defendants' request for attorney's fees under 28 U.S.C. § 2202, which will be handled separately when the Court addresses Defendants'/Cross-Plaintiffs' Motion for Entry of Declaratory Judgment.

The Court DEFERS ruling on the issue of whether the state court jury's award of punitive damages is covered under the MCC policies until the Court considers Plaintiff's Motion for Summary Judgment on Punitive Damages (Doc. 145).

**FINALLY,** the Court notes that Plaintiff has filed a Motion for Leave to File First Supplemental Complaint which challenges the amount awarded by the jury in the state court lawsuit, seeking to reduce the amount of damages. *See* Doc. 142. The Court herein grants Defendants' motion for summary judgment on the issue of coverage; whether MCC is obligated to indemnify the full amount awarded by the jury will be determined at a later time when the Court decides Plaintiff's Motion for Leave to File First Supplemental Complaint.

_____

UNITED STATES DISTRICT JUDGE