# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MID-CONTINENT CASUALTY CO.,

    Plaintiff,

    v.      No. CIV-11-0329 WJ/LAM

I&W, INC., CIRCLE S FEED STORE, LLC,
RICHARD L. MENUEY and MARY L. MENEUY,

    Defendants.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PUNITIVE DAMAGE CLAIM

THIS MATTER comes before the Court upon Mid-Continent Casualty Co.'s Motion for Summary Judgment on Punitive Damage Claim, filed December 19, 2014 **(Doc. 145).** The Court previously denied this motion as moot following the grant of summary judgment to Plaintiff on coverage. However, the case was remanded by the Tenth Circuit Court of Appeals, and the Court now revisits the motion. Having reviewed the parties' briefs and applicable law, the Court finds that Plaintiff's motion is not well-taken. Accordingly, it is DENIED.

### BACKGROUND

This case is essentially an insurance coverage dispute in which the parties seek a determination of whether Plaintiff ("MCC") owes Defendant I&W, Inc. ("I&W") a duty to indemnify I&W for damages sought and awarded in an underlying state court action. I&W owned and operated a brine well facility which was involved in the solution mining of salt from brine water. In such an operation, a well is drilled into a salt zone. The operator injects fresh water into the salt zone where the water dissolves the salt. The resulting brine water is pumped

out and sold. Through the mining process, the salt zone dissolves away from the earth in which it was embedded, leaving behind an underground cavern. I&W's solution mining operations took place between 1995 and 2008.

## I. Underlying State Court Lawsuit

In the state court lawsuit, the Circle S Defendants[1] sued I&W for property damage due to its solution mining operation underneath the property owned by I&W and Defendants, which occurred when the roof of the underground cavern collapsed as a result of the solution mining operation. As plaintiffs in the underlying state court litigation, the Circle S Defendants alleged that their property had been diminished in value due to I&W's mining operation. The lawsuit was filed in November of 2009 in the Fifth Judicial District Court, State of New Mexico, County of Eddy, and is styled as *Circle S Feed Store, LLC, Richard L. Menuey and Mary L. Menuey v. I&W, Inc.,* case number CV-2009-793 ("state court lawsuit"). On February 27, 2012, a verdict was reached in favor of the Circle S parties. The jury found I&W to be 100% negligent, as well as reckless or wanton, and that this negligence was the cause of the property damage. The jury awarded Defendants $703,000.00 in compensatory damages and $300,000.00 in punitive damages. *See* Doc. 93, Defts' MSJ, Ex. B; Doc. 82 (MCC's MSJ), Ex. 26, Ques. No. 6; Doc. 137; Doc. 135-1 (state court Judgment, 4/24/2012).

## II. Federal Action and Appeal

---

[1] For ease of reference, "Circle S Defendants" refers to Richard L. Menuey and Mary L. Meneuy and Circle S Feed Store, LLC. Defendant I&W was initially dismissed voluntarily from the federal lawsuit on July 13, 2011 pending relief from the automatic stay from the United States Bankruptcy Court, District of New Mexico, *see In re I&W, Inc.*, cause number 10-12366-j7 ("bankruptcy case"), Doc. 4. A relief from stay was granted on MCC's motion on August 2, 2011. See Doc. 18 at 1. The Court subsequently granted Plaintiff's motion to amend the complaint to join I&W as a necessary party to this action because it is the owner of the policies at issue. See Doc. 19. However, pursuant to an order of the Bankruptcy Court, Circle S and the Menueys were given the authority to "take the lead in litigating the issues that are the subject matter of the Litigation so that I&W and the Trustee will not be expected or required to litigate the issues." (Doc. 18-1).

Prior to the entry of judgment in the state court lawsuit, MCC filed a declaratory judgment action in this Court seeking a declaration that the insurance policies did not afford liability insurance coverage for the claims asserted against I&W in the underlying lawsuit, and that it had no duty to pay any judgment or settlement.  The parties filed cross-motions for summary judgment in the federal action on coverage issues, and on October 31, 2012, the Court granted summary judgment in favor of MCC, noting that were it not for the "Oil Endorsement provision" in the insurance policy, Plaintiff's motion would have been denied and the Court would have found that coverage existed.  The Court specifically pointed out that the Circle S Defendants had offered no argument in response on the Oil Provision argument raised by Plaintiff in its summary judgment motion:

> Defendants' response to Plaintiff's argument on this issue is less than half a page. Defendants offer no legal argument or factual basis as to the applicability of the provision to the facts at hand.

See Doc. 114 at 9.   On the Circle S parties' motion, the Court amended the Final Judgment to note that the Court "would have found that coverage existed, but for the language in the Oil Industries Limitation Endorsements." *See* Doc. 120, Amended Final Judgment. Defendants appealed the Court's ruling and on June 17, 2014, the Tenth Circuit reversed in part, finding that the oil industries limitation endorsement in company's excess/umbrella policies did not apply to preclude coverage under its primary CGL policies. *Mid-Continent Cas. Co. v. Circle S Feed Store, LLC*, 754 F.3d 1175 (10th Cir. 2014).   The Court of Appeals agreed with this Court's conclusion that the Oil Endorsement provision excludes coverage, but noted that coverage was excluded *only* under the excess or umbrella policies, and that the Oil Endorsement provision did not exclude coverage under the primary policies.  Following remand, this Court entered a denial

of summary judgment, and further granted the Circle S Defendants summary judgment on their cross-motion. *See* Doc. 157 (Mem.Opin. & Order).

In the remand order, the Tenth Circuit also reversed this Court's ruling that MCC's motion for punitive damages was moot, 754 F.3d at 1186. The Court now considers that motion.

## DISCUSSION

In the instant motion, MCC contends that none of the policies provide coverage for punitive damages.

**I.      Legal Standard**

Under Pursuant to Rule 56, a party is entitled to summary judgment if it can establish "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Only disputes of material fact "preclude the entry of summary judgment." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1111 (10th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party meets its burden, "the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Herrera*, 506 F.3d at 1309 (citation and internal quotation marks omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court "examine[s] the record and all reasonable inferences that might be drawn from it in the light

most favorable to the non-moving party." *Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1302 (10th Cir. 2011).

## II.     Undisputed Facts[2]

The undisputed facts can be summed up as follows. Lowell Irby formed I&W with a partner in 1957. Lowell's son, Eugene Irby, began working at I&W in 1990 and eventually became its vice president and general manager in 2001 or 2002, and worked as I&W's business manager in 1995. Both Lowell and Eugene were aware of the brine well mining process, in that it involved fresh water injection in a well to wash salt from the geological formation to make a brine solution that is then pumped out of the well. George Parchman, a manager at I&W, was in charge of the day-to-day operation of the brine well starting in 1995. Kevin Wilson also worked for I&W for 26 years and took over the day-to-day operation in 2005 or 2006.

When I&W purchased the solution mining operation from B&E in 1995, Lowell Irby knew that solution mining creates an underground cavern and that water injected into the brine well washes away the salt formation. Eugene Irby knew salt was mined to produce brine by injecting fresh water, making a solution and pumping it out, and that the solution mining washes the salt from the formation. He also knew that as the salt is washed out of the formation, the cavern becomes bigger and bigger. Mr. Parchman was aware that one of the reasons I&W performed pressure testing of the wells was to make sure I&W was not washing out salt deeper into the salt bed.

MCC issued a Commercial Liability Policy No. 04-GL-000031211, for the period June 1, 2000, through June 1, 2001 which was renewed each year through June 1, 2009, and an Umbrella or a Commercial Excess Policy No. XS 110462, for the period June 1, 2000, through

---

[2]     The Court omits the undisputed facts that are not relevant to the issues, and for ease of reading generally omits references to supporting exhibits, which are contained in the parties' briefs.

5

June 1, 2001 (the "Umbrella"), which was renewed each year through June 1, 2005 (collectively, "the policies"). The relevant provision in the liability policy states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

*See* Doc. 82-12.   The above facts are undisputed, but there is some disagreement on some of the facts relating to subjective intent and expertise of the I&W representatives.  It is undisputed that I&W representatives, including Lowell Irby, were aware of the salt mining process, including an awareness that solution mining creates an underground cavern.  Plaintiff also suggests that these individuals were experts who were actually aware that the cavern would eventually fall in and cause damage to Defendants' property, but the evidence presented falls short of MCC's intention.  For example, Plaintiff presents Fact 9 which states that Mr. Parchman was "knowledgeable about brine wells."  However, the cited deposition testimony says only that Mr. Parchman "knew more about the brine wells than any of us did."  Doc. 82, Ex. 1 (Irby Dep.) at 37:17-20.  Considering that Parchman acknowledged that neither he nor anyone else with I&W "had expertise on brine wells," Plaintiff's gloss on Parchman's deposition testimony misrepresents the facts.  *See* Doc. 82-4 at 157:15-17.  Also, in Facts 12 and 13, Plaintiff states that Mr. Parchman was aware of the danger of creating a cavern below the surface of the brine wells, and was also aware of the danger of collapse due to mining operations prior to the time he ceased working for I&W, sometime in 2006.  Defendants point out that this "awareness" did not extend to a particular concern about mining salt from under Defendants' land.   According to the cited deposition testimony, Mr. Parchman stated that the New Mexico Oil Conservation Division ("OCD") made him aware of the danger of creating a cavern beneath the ground surface, but was also made aware of doing "everything that we were supposed to do," which included running

6

surveys and reporting the amount "washed every month" in the operations. Doc. 82-4 at 157:1-10.[3]

There is similar disagreement regarding the knowledge and awareness of Kevin Wilson, I&W's Operations Manager. In Facts 18-21, Plaintiff states that Mr. Parchman taught Mr. Wilson about solution mining; that Wilson knew that in solution mining, water is forced down to wash the salt out of the formation, and that he assumed the cavern would continue to grow as more brine was produced. Doc. 82-8 at 8:7-8. However, none of the evidence cited to support Facts 18-21 can be read to suggest that any knowledge or awareness of the potential dangers of salt mining on the part of I&W representatives extended to an awareness or particular concern concerning Defendants' property. Rather, even though Wilson understood that caverns get bigger in size as more brine is produced, he "never thought about" whether a cavern could form as a result. Doc. 143-8 at 8:9-19 (Defts' Add'l Facts). I&W did not specifically understand that they were mining underneath the neighboring property that belonged to Defendants. Doc. 143-6 at 19:3-15. Also, Wilson was unaware that there had been collapses of caverns from salt mining operations in other states and countries. Doc. 143-8 at 9:12-19.

After reviewing the facts presented by both parties, the Court finds that the material and relevant facts remain undisputed, including the facts concerning the subjective intent and expertise of the I&W representatives. The only question is whether as a matter of law, based on those facts and the language of the policies, MCC is obligated to indemnify I&W for the punitive damages awarded by the jury in the underlying lawsuit. *See Grimes v. Swaim*, 971 F.2d 622, 624 (10th Cir.1992) ("The construction of an insurance policy is a matter of law").

### III. Whether MCC Policies Provide Coverage for Punitive Damages

---

[3] The awareness and subjective intent of various I&W representatives is also discussed in the Court's rulings on Defendants' Motion for Summary Judgment. **INSERT DOC NUMBER OF MOO HERE.**

New Mexico law permits coverage for punitive damages, although liability insurers could not be obligated to provide this coverage. *State Farm Mut. Auto Ins. Co. v. Progressive Specialty Ins. Co.,* 131 N.M. 304 (Ct.App. 2001). An insurance contract by its express language may exclude coverage of punitive damages and only "[w]here an insurance company fails to clearly exclude coverage of punitive damages and an insured reasonably expects such coverage" will a New Mexico court construe the contract against the insurer.[4] *Rummel v. St. Paul Surplus Lines Ins. Co.*, 123 N.M. 767, 773 (1997). Plaintiff correctly asserts that specific or express language is not required in order to effectuate a punitive damage exclusion. 123 N.M. at 767 (citing *Baker v. Armstrong,* 106 N.M. 395 (1987)).

A.   Policy Language

MCC first argues that punitive damages are not covered under the policy language because Defendants do not contend that any of the MCC policies are ambiguous with respect to the issue of punitive damages coverage. However, Defendants are not arguing ambiguity in the policy provisions; rather, they argue that there is *no* language at all that could be read as an exclusion for coverage for punitive damages. Plaintiff attempts to read into the policy language something that is just not there. For example, MCC claims that the absence of any definition of "punitive damages" indicates that such damages are not covered, because the policy does contain a definition for "property damage." *See* Doc. 82-11, ¶ 17. The Court fails to see how the absence of a *definition* for "punitive damages" constitutes an exclusion for coverage. If anything, the policy language indicates that punitive damages would not be treated any differently from other damages. The policy does contain a list of exclusions such as one "bodily

---

[4]   Plaintiff mistakenly states that the contract would be construed against the "insured," Doc. 145 at 8, but this is incorrect. *See Rummel,* 123 N.M. at 773 ("Where punitive damage exclusions lack the clarity required by *Baker*, this Court will construe the contract against the *insurer* and require coverage of punitive damages, provided that such an interpretation of the contract is in compliance with the probable expectations of the parties") (emphasis added).

injury" or "property damage" that is "expected or intended from the standpoint of the insured," but there is no exclusion listed for punitive damages. Doc. 82-11, ¶ 2(a).

On the other hand, Defendants' argument has merit because they refer to policy language which can be reasonably read to mean that MCC has not excluded coverage for punitive damages. The policy provides that MCC must pay "those *sums* that the insured becomes legally obligated to pay as damages *because of . . . property damage . . .*" (emphasis added). There is no question that I&W was found to have caused the property damage and that it is now legally obligated to pay the damages awarded by the jury. In requiring the insurer to pay "sums," the policy language does not distinguish between compensatory or punitive damages, and the jury's award of punitive damages was "because of property damage" as much as the compensatory damages that were awarded. An insurance contract may exclude coverage of punitive damages "in any manner which would bring the exclusion to the attention of the average insured." 123 N.M. 767. Here, there is no language or provision in the policy would alert I&W as the insured that punitive damages were somehow excluded, nor is there any reference to an incorporation of an exclusion in any other policy that may have been issued to I&W. *Cmp. Rummel,* 123 N.M. at 771 (exclusion of punitive damages can be accomplished through reference to exclusions contained in other policies, without expressly stating what those exclusions are).

B.   Jury's Findings[5]

Plaintiff's second argument is that the jury's finding that I&W's acts were wanton or reckless precludes coverage for punitive damages because reckless or wanton conduct is not an

---

[5] This argument is a "throwaway" argument, one that the Court entertains merely because it was raised by the parties. Issues pertaining to the evidence supporting the state court jury's award of punitive damages is not necessary to the question of whether the MCC policies can be interpreted to afford coverage for punitive damages, which is a question involving contract interpretation. *See Farmers Alliance Mut. Ins. Co. v. Bakke,* 619 F.2d 885, 888 (10th Cir. 1980). An appeal to the New Mexico Court of Appeals would have been the proper method of challenging the sufficiency of the evidence to support the state court jury's award of punitive damages.

"accident" covered by the policy. Under the policy, insurance applies to "bodily injury" and "property damages" only if it is caused by an "occurrence" that takes place in the "coverage territory." Doc. 82-11 at 3, ¶ 1(b). The policy defines "occurrence" as an "accident including continuous or repeated exposure to substantially the same general harmful conditions." Doc. 82-11 at 5, ¶ 13. While the term "accident" is not defined in the policy, New Mexico law defines "accident" as an event that takes place without one's foresight or expectation, or an event "which is not expected or designed." *O'Rourke v. New Amsterdam Cas. Co.*, 68 N.M. 409, 412 (1961) (terms not defined in policy must be interpreted in its usual, ordinary and popular sense); *Vihstadt v. Travelers Ins. Co.*, 103 N.M. 465, 466 (1985)) (defining "accident" as an event that occurs without design or purpose). *See* Doc. 114 at 5-6 (Court's Mem.Opin. & Order).

MCC's position on this issue is untenable because it ignores the Tenth Circuit's affirmance of this Court's finding that there was an "occurrence" under the MCC policies. *See* 754 F.3d 1175, 1182-83 ("[t]he district court correctly concluded that the damages to Circle S's property were caused by an "occurrence" and are thus covered under the primary policies").

Here again, Defendants' argument fares better. Defendants contend that policy terms do envision the damage to the Circle S Defendants' property, since the damage was not something that was "expected or intended," in which case the policy exclusions would apply. Also, the jury found that I&W was negligent and reckless, but did not find that the damage was expected or intended. The jury was not asked to find whether I&W's conduct was malicious, willful or in bad faith—all of which might indicate something other than an "accident" under the terms of the policy. Finally, the undisputed facts do not support a finding that any of the I&W representatives knew or expected the damage that occurred as a result of the cavern collapse. In the underlying

state court lawsuit, counsel for the Circle S parties characterized I&W's conduct as a failure to take appropriate measures rather than intentional:

> The evidence will show that the I&W operation was what in law is described as wanton. They did not do anything to prevent harm. They did not even bother to find out what harm could be.

Doc. 145-1 at 4:17-20.  In closing, counsel argued for the imposition of punitive damages based on I&W's "reckless or wanton" conduct:

> And punitive damages involve a finding of either reckless or wanton, all you have to do is find one. Reckless is the intentional act with — do something intentionally with utter indifference to the consequences. **They intentionally went into the solution mining business, and what concern did they have about the consequences, none.**

Doc. 145-2 at 4:12-19.   While I&W intentionally carried out the salt mining process, the property damage occurred because the well operatives did not care about potential consequences. However, the "intentional" acts that are carried out while operating a brine well facility are not the same as carrying out acts to "intentionally" cause damage to the Circle S parties' property, as the Court has previously noted:

> Based on the available testimony, it appears that Lowell and Eugene Irby were aware that salt mining leaves behind underground caverns, but none of the testimony can be characterized as stating they expected or designed that the caverns would grow to a size that would result in property damage. *Cmp. Vihstadt v. Travelers Ins. Co.*, 103 N.M. 465, 466, 709 P.2d 187, 188 (1985) (holding aspirin poisoning following intentional ingestion of 50 aspirin was not an accidental injury under health policy, where stated intention was to commit suicide); *Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, --- F.Supp.2d ----, 2012 WL 1132499 (D.N.M.,2012) (where contractor's intent in designing water diversion system was to divert water on landowner's property, flooding of landowner's property was not an "occurrence" or "accident" under the policy).

Doc. 114 at 6 (Court's Mem. Opin. & Order).[6]  Therefore, the jury's finding regarding I&W's conduct does not preclude coverage for punitive damages.

---

[6] The Tenth Circuit did not reverse any of the Court's findings interpreting the terms of the contract.

C.   Public Policy

Plaintiff contends that public policy disfavors shifting the burden for reckless and wanton conduct on the part of the insured to the insurer because it has society bear the burden of the wrongdoing instead of the tortfeasor.   To support this contention, MCC relies on an Oklahoma case which found that the policy provision was sufficiently broad to include liability for punitive damages, but ultimately looked to public policy objectives "of reparations for the sake of civil punishment" as the determinative factor in resolving whether an insurer is liable for punitive damages.  *Dayton Hudson Corp. v. American Mut. Liability Ins. Co.*, 621 P.2d 1155, 1158 (Okla., 1980).[7]  In *Dayton,* the Oklahoma Supreme Court held that a culpable party "is not to be permitted to escape the civil consequences of its wrong," but also recognized an exception to that policy where liability is vicariously imposed on an employer for an employee's wrongdoing. For this reason, the court held back from pronouncing that there was no coverage in that case, pending a finding of fact regarding the employer/insured's prior knowledge of the employee's "vicious propensities."  621 P.2d at 1160-61.

The *Dayton* case is not dispositive here.  First, it is based on Oklahoma law, and addressed for the first time whether language in a policy can be sufficiently broad to include punitive damage coverage.  It recognized a split in authority with "the majority holding the terms of the policy embrace liability for punitive damage." *Id.* at 1158.  Second, *Dayton* recognized a split in authority on whether public policy barred the insurance of punitive damages.   Parties have not raised or briefed the issue of whether New Mexico law applies in this case, but it appears that New Mexico law governs, based on the parties reference to New Mexico cases in

---

[7]  Ironically, the language which *Dayton* found to be "sufficiently broad to include liability for punitive damages" was very similar to the one here in that it obligated the insurer to "pay for all sums which the insured might become legally obligated to pay."   Notwithstanding this similarity, MCC still argues that the policy language at issue here excludes coverage for punitive damages.

general and because this is a diversity action (*see Complaint, ¶¶ 6 & 7)* where federal courts are required to apply the law of the forum state. *Armijo v. ExCam, Inc.,* 843 F.2d 406 (10th Cir. 1988). Thus, Plaintiff's citation to other jurisdictions is unavailing because New Mexico "has never announced a public policy which would render unenforceable contracts insuring against liability for punitive damages." *Baker,* 106 N.M. at 397. In fact, New Mexico law has come down on the side of the majority of jurisdictions finding that the purchase of insurance cannot be "presumed to encourage the conduct sought to be deterred by exemplary of punitive damages":

> **Therefore, this Court joins the majority of jurisdictions which allow insurance contracts to cover liability for punitive damages**. Citizens and their insurers should have the right to contract for insurance against the possibility of a judicial decision finding that a person's conduct rises above ordinary negligence and justifies punitive damages. **If insurance companies market policies which consumers reasonably expect cover all damages, then the insurer should honor that contract.** Contracts should be held invalid against public policy only if there is an evil tendency connected with the contract itself, and insurance coverage of punitive damages has not been related in any substantial way to the commission of wrongful acts.

*Baker,* 106 N.M. at 398-99 (omitting footnote and citations) (emphasis added). Defendants offer portions of a decision from the Texas Court of Appeals which is not precedent but which the Court finds is a cogent and convincing explanation of why public policy should *not* inhibit coverage for punitive damages:

> It is one thing for an insurance company to write a policy with provisions which exclude liability for punitive damages and to ask that this court construe and apply such policy provisions. It is quite another thing, however, for an insurance company which has written and issued an insurance policy in terms which include coverage for punitive damages—presumably at a premium which the insurance company believed to be sufficient as consideration for such coverage—to ask this court to relieve it from such liability under its own insurance contract by a judicial declaration that the contract is void for reasons of public policy.

*American Home Assur. Co. v. Safeway Steel Products Co*., 743 S.W.2d 693, 702 (Ct.App.Tex. 1987). New Mexico follows other jurisdictions (like *Dayton,* cited by Plaintiff) which do not

13

have a public policy "which requires denial of coverage" for willful acts, *Baker,* 106 N.M. at 397, and requires coverage where the policy is broad enough to include coverage for punitive damages.[8]  Accordingly, public policy does not preclude coverage for the jury's punitive damage award.

## CONCLUSION

In sum, the Court finds and concludes that MCC's motion on punitive damages shall be denied because (1) No New Mexico public policy exists against insuring for punitive damages; (2) The relevant policies do not contain an exclusion of punitive damages, nor do the policies make a distinction between intentional and unintentional damages; and (3) the jury's finding is consistent with I&W's conduct being within the policy terms as an "accident."  Finally, the Court declares that policies require Plaintiff to pay sums which I&W became legally obligated to pay as damages as a result of the jury verdict, including punitive damages.

Defendants request attorney fees, expenses and costs pursuant to 28 U.S.C. §2202.  The Court defers ruling on this request until the time it considers Defendants' Motion for Entry of Declaratory Judgment (Doc.135).

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE

---

[8]  *See American Home,* 743 S.W.2d at 702 ("punitive damages are covered because they always "arise" out of the underlying action for injury); *South Carolina State Budget & Control Board v. Prince*, 304 S.C. 241, 403 S.E.2d 643 (1991) (phrase "legally obligated to pay as damages" found to encompass punitive damages); *Fluke Corp. v. Hartford Acc. & Indem. Co*., 34 P.3d 809, 814, 145 Wash.2d 137, 147 (Wash.,2001) (policy promised to indemnify for all damages, compensatory or punitive, where the policy used the general term "damages," made no distinction between compensatory and punitive damages, and contained no exclusion for the payment of punitive damages).